## OTOE COUNTY *v.* BALDWIN.
## BALDWIN *v.* OTOE COUNTY.

### IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEBRASKA.

Submitted January 4th, 1884.—Decided March 17th, 1884.

*Jurisdiction—Legislative Authority—Municipal Bonds—Municipal Corporations—Nebraska—Practice—Statutes.*

Bonds to the amount of $40,000 were issued by the county of Otoe, in the State (then Territory) of Nebraska, to the Council Bluffs and St. Joseph Railroad Company, as a donation to that company to aid in the construction of a railroad in Fremont County, Iowa, to secure to said Otoe County an eastern railroad connection. Notwithstanding any defects or irregularities in the voting upon or issuing said bonds, they were validated by § 8 of the act of the legislature of the State of Nebraska, passed February 15th, 1869 (Laws of 1869, p. 92), entitled "An Act to enable counties, cities, and precincts to borrow money on their bonds, or to issue bonds to aid in the construction or completion of works of internal improvement in this State, and to legalize bonds already issued for such purpose," taken in connection with another act of said legislature of the same date (Laws of 1869, p. 200).

The decision of this court in *Railroad Company* v. *County of Otoe,* 16 Wall. 667, cited and applied.

The legislature of a State, unless restrained by its organic law, has the right to authorize a municipal corporation to issue bonds in aid of a railroad, and to levy a tax to pay the bonds and the interest on them, with or without a popular vote, and to cure, by a retrospective act, irregularities in the exercise of the power conferred.

VOL. CXI—1

The first of said acts of February 15th, 1869, was not in violation of section 19 of article 2 of the Constitution of Nebraska, of 1867, which provided that "no bill shall contain more than one subject, which shall be clearly expressed in its title."

Where an action of law is tried by a Circuit Court, without a jury, and the facts on which, on a writ of error, the plaintiff in error seeks to raise a question of law, are not admitted in the pleadings, or specially found by the court, and there is a general finding for the defendant in error on the cause of action which involves such question of law, and there is no exception by the plaintiff in error to any ruling of the court in regard to such question, this court can make no adjudication in regard to it.

On the 1st of April, 1882, John T. Baldwin brought a suit at law, in the Circuit Court of the United States for the District of Nebraska, against the county of Otoe, in the State of Nebraska, to recover the amount due on sundry coupons cut from bonds issued by that county, the coupons being payable, some January 1st, and others July 1st, in each year, from and including 1870 to and including 1881, and January 1st, 1882. On the 11th of August, 1882, Baldwin brought another suit at law, in the same court, against the same defendant, to recover the amount due on sundry other coupons, cut from bonds issued by that county, the coupons being payable, some January 1st, and others July 1st, in each year, from and including 1878 to and including 1882. The bonds were issued by the county, while Nebraska was a Territory, to the Council Bluffs and St. Joseph Railroad Company, the principal being payable January 1st, 1887, with interest from January 1st, 1867, at the rate of 10 per cent. per annum, payable on July 1st and January 1st, in each year. The amount of the principal of the bonds was $40,000, they bore date November 12th, 1866, and were signed by the chairman of the board of county commissioners, and the treasurer, and attested by the county clerk, and bore the seal of the county, and were payable to the company or its assigns, and each bond was assigned by it, by an assignment under its seal, to the bearer, indorsed on the bond, and dated November 18th, 1869. Each bond contained the following statement:

"This bond is one of a series of one hundred and sixty, of the like tenor and date, one hundred of which are for one hundred

dollars, and sixty of which are each for five hundred dollars, in the aggregate amounting to the sum of forty thousand dollars, executed and issued, or to be issued from time to time, as the wants of said county shall require, to pay to the Council Bluffs and St. Joseph Railroad Company, as an appropriation made by said county to said railroad company, to aid in the construction of the railroad of said company, to be located in Fremont County, Iowa, through a point most convenient to Nebraska City. This debt is authorized by a vote of the legal voters of said county of Otoe, taken at an election held under and by virtue of an order of the county commissioners of said county, on the 17th day of March, 1866, in pursuance with the several acts of the legislature of the Territory of Nebraska, in such cases made and provided, and a resolution of the board of county commissioners of said county granting such aid."

Nebraska City is in the county of Otoe, on the west bank of the Missouri River. Fremont County, in Iowa, adjoins Otoe County on the east, being separated from it only by the Missouri River. Council Bluffs is in Iowa, on the east bank of the Missouri River, above Fremont County, and 40 to 50 miles above Nebraska City. St. Joseph is in Missouri, on the east bank of the Missouri River, below the other places named.

On the 6th of January, 1860, the legislative assembly of the Territory of Nebraska passed an act (Laws of 1859–60, 6th Session, p. 112) entitled "An Act to authorize Otoe County to subscribe and take stock in any railroad located or to be located in Fremont County in the State of Iowa." This act contained the following provisions:

"That the Board of County Commissioners for Otoe County may at any time, by an order of said board, cause an election to be held for the purpose of ascertaining the will of the people of Otoe County, as to the propriety of said county subscribing stock for any amount not exceeding seventy-five thousand dollars, to any railroad company for the purpose of constructing any railroad now, or hereafter, to be located in Fremont County and State of Iowa. § 2. If a majority of the legal voters of said county shall vote in favor of such proposition, then the board of county

commissioners of Otoe County shall issue the bonds of said county for whatever amount of stock it may have been decided upon by such vote, to any such railroad company, which bonds shall not bear any greater interest than ten per cent. per annum."

On the 11th of January, 1861, the legislative assembly of the Territory passed an act (Laws of 1860–61, 7th Session, p. 146) entitled "An Act to define the powers and duties of county commissioners and county clerk." This act created in each county a board of county commissioners, consisting of three persons. It also provided as follows:

"§ 24. The said commissioners shall have power to submit to the people of the county, at any regular or special election, the question whether the county will borrow money to aid in the construction of public buildings, the question whether the county will aid or construct any road or bridge, or to submit to the people of the county any question involving an extraordinary outlay of money by the county; and said commissioners may aid any enterprise designed for the benefit of the county as aforesaid, whenever a majority of the people thereof shall be in favor of the proposition as provided in this section. § 25. When county warrants are at a depreciated value, the said commissioners may, in like manner, submit the question whether a tax of a higher rate than that provided by law shall be levied, and in all cases when an additional tax is laid in pursuance of a vote of the people of the county, for the special purpose of repaying borrowed money, or of constructing or ordaining to construct any road or bridge, or for aiding in any enterprise contemplated by the 21st section of this act, such special tax shall be paid in money and in no other manner. § 26. The mode of submitting the questions to the people, contemplated by the last two sections, shall be the following: The whole question including the sum desired to be raised, or the amount of tax desired to be levied, or the rate per annum, and the whole regulation, including the time of its taking effect, or having operation, if it be of a nature to be set forth, and the penalty of its violation, if there be one, is to be published at least for four weeks in some newspaper published in the county. If there be no such newspaper the publication is to be made by being posted up in at least one of the most public places in each

election precinct in the county, and in all cases the notices shall name the time when such question shall be voted upon, and the form in which the question shall be taken, and a copy of the question submitted shall be posted up at each place of voting during the day of election. § 27. When the question submitted involves the borrowing or expenditure of money, the proposition of the question must be accompanied by a provision to lay a tax for the payment thereof, in addition to the usual taxes under section sixteen of this act; and no vote adopting the question proposed shall be valid, unless it likewise adopt the amount of tax to be levied to meet the liability incurred. § 28. The rate of tax levied in pursuance of the last four sections of this act, shall, in no case, exceed more than three mills on the dollar, of the county valuation, in one year. When the object is to borrow money to aid in the erection of public buildings, as provided, the rate shall be such as to pay the debt in ten years. When the object is to construct, or aid in constructing, any road or bridge, the annual rate shall not exceed one mill on a dollar of the valuation; and any special tax or taxes levied in pursuance of this act, becoming delinquent, shall draw the same rate of interest as ordinary taxes levied in pursuance of the revenue laws of this Territory. § 29. The said commissioners being satisfied that the above requirements have been substantially complied with, and that a majority of the votes cast are in favor of the proposition submitted, shall cause the same to be entered at large upon the book containing the record of their proceedings; and they shall then have power to levy and collect the special tax in the same manner that the other county taxes are collected. Propositions thus acted upon cannot be rescinded by the board of county commissioners. § 30. Money raised by the county commissioners in pursuance of the last six sections of this act, is specially appropriated and constituted a fund distinct from all others in the hands of the county treasurer, until the obligation assumed is discharged."

The records of the commissioners of Otoe County, and the records of that county, showed the following facts: The county clerk called a meeting of the commissioners of Otoe County, to be held February 24th, 1866, "to take into consideration the question of submitting to the people of said county the issuance of the bonds of said county, not exceeding $200,000

in amount, to be used in securing to said county an eastern railroad connection." The meeting was held on that day, two commissioners being present, and it was ordered that an election be held on the 17th of March, 1866, in and throughout the county of Otoe, "for the purpose of ascertaining whether the commissioners of Otoe County shall issue bonds, not to exceed $200,000, for the purpose of securing an eastern railroad connection for Nebraska City, N. T." The election was held on the day named, and the vote was 1,362 for, and 201 against, "the issuing of $200,000 for the purpose of securing an eastern railroad connection for Nebraska City." On the 9th of November, 1866, the commissioners, three being present, made the following order:

"Ordered, that ($40,000) forty thousand dollars be donated to the Council Bluffs and St. Joseph Railroad Company, provided that said railroad company locate their road within one and a half miles of the Ferry Landing at Nebraska City, N. T., and secure to Nebraska City and to Otoe County an eastern railroad connection on or before the 1st day of September, 1876, by the way of St. Joseph, Mo. The above order was made in conformity of a vote of legal voters of Otoe County, taken at an election duly held under and by virtue of an order of the county commissioners of said county, on the 17th day of March, 1866, in pursuance of the several acts of the legislature of the Territory of Nebraska, in such cases made and provided."

The bonds were issued and were received by the railroad company, $7,000 on the 24th of November, 1866, $20,000 on the 23d of February, 1867, and $13,000 on the 13th of November, 1867. Nebraska became a State on the 1st of March, 1867. 14 Stat. 820.

On the 15th of February, 1869, the legislature of the State passed an act, Laws of 1869, p. 92, entitled "An Act to enable counties, cities, and precincts to borrow money on their bonds, or to issue bonds to aid in the construction or completion of works of internal improvement in this State, and to legalize bonds already issued for such purpose." The first seven sections of this act authorized counties, cities, and precincts in the

Statement of Facts.

State to issue bonds to aid in the construction of railroads and other works of internal improvement, and prescribed regulations in respect to the same, embracing the taking of a prior vote of the legal voters of the county, city, or precinct, and the laying of taxes to pay the principal and interest of the bonds. Section 8 was as follows:

"§ 8. All bonds heretofore voted and issued by any county or city in this State to aid in the construction of any railroad or other work of internal improvement, are hereby declared to be legal and valid, and a lien upon all the taxable property in such county or city, notwithstanding any defect or irregularity in the submission of the question to a vote of the people, or in taking the vote, or in the execution of such bonds, and notwithstanding the same may not have been voted upon, executed, or issued in conformity with law, and such bonds shall have the same legal validity and binding force as if they had been legally authorized, voted upon, and executed; *Provided,* That nothing in this section, nor in this act, shall be so construed as to legalize or in any way sanction any vote of the people of Nemaha County heretofore had, for the purpose of aiding in the construction of any railroad, nor anything done by the county commissioners of said county authorizing said vote, or anything done by them in consequence of such vote."

On the same day the legislature of the State passed another act, Laws of 1869, p. 260, entitled "An Act to authorize the county commissioners of Otoe County to issue the bonds of said county to the amount of $150,000 to the Burlington and Missouri River Railroad, or any other railroad running east from Nebraska City." This act provided as follows:

"Whereas the qualified voters of the county of Otoe and State of Nebraska have heretofore, at an election held for that purpose, authorized the county commissioners of said county to issue the bonds of said county, in payment of stock, to any railroad in Fremont County, Iowa, that would secure to Nebraska City an eastern railroad connection, to the amount of two hundred thousand dollars, and whereas but forty thousand dollars have been issued: Section 1. *Therefore, be it enacted by the Legislature of the State*

*of Nebraska,* That said commissioners be, and they are hereby, authorized to issue one hundred and fifty thousand dollars of the bonds aforesaid to the Burlington and Missouri River Railroad Company, or any other railroad company that will secure to Nebraska City a direct eastern railroad connection, as a donation to said railroad company, on such terms and conditions as may be imposed by said county commissioners. Sec. 2. Said bonds, when so issued, are hereby declared to be binding obligations on said county, and to be governed by the terms and conditions of an act entitled 'An Act to enable counties, cities, and precincts to borrow money or to issue bonds to aid in the construction or completion of works of internal improvement in this State, and to legalize bonds already issued for such purpose,' approved February, A.D. 1869."

After an answer and a reply in each suit the two suits were consolidated. The petitions by which the suits were commenced alleged, in respect to each of the bonds from which the coupons sued on were cut, that it was issued and delivered to the company, and assigned by it in blank, and was sold and delivered by it for value, and has in due course of business come to the plaintif, "who has become and is the true .nd lawful owner and holder thereof, together with the coupons thereto annexed, and without any knowledge of any facts, if any there be, affecting its validity;" that, by the second act of February 15th, 1869, above cited (which the petitions call an act of the legislature of the Territory), the Territory recognized the due issue of the bonds; and that said county paid all of the coupons attached to said bonds when the same were issued, except those which matured on and afte· January 1st, 1870.

The answers denied all the allegations of the petitions, except those expressly admitted. They denied that the county issued or delivered the bonds. They admitted that the board of county commissioners issued and delivered the bonds and coupons to the company, but aver that they did so without legal authority; that neither the question of issuing the bonds nor the proposition to lay or levy a tax for the payment of the bonds or coupons was ever submitted to or voted or passed upon by the voters or people of the county; that the bonds

were a donation by the commissioners to the company, for which the county received no consideration; that the company was an Iowa corporation, having its road wholly in that State; that it obtained the bonds upon an agreement with the commissioners, with which it did not comply, as to where it would build its road and establish a depot; that the plaintiff had notice of all said facts when he received the bonds and coupons, and paid no consideration for them; that the Territory of Nebraska did not, by said second act of February 15th, 1869, recognize the due issue of the bonds; and that said act was unconstitutional and void, and was not retrospective or retroactive, and did not pretend to authorize or legalize any bond or bonds made or issued before that act was passed. The answer in the second suit alleged as an additional defence, that the question of issuing the bonds, and the sum to be raised, and the amount of tax, and its rate, was not published before March 17th, 1866, or at any time, in any newspaper published in the county, nor posted up in any election precinct, nor was any question of issuing any bonds to said company ever so published or posted up, and no copy of any question to be submitted and voted on by the people of the county at said election was posted up at any place of voting in the county during the 17th of March, 1866. The replies denied the matters set up in the answers.

A trial by jury having been duly waived in the consolidated action, it was tried before the circuit judge and the district judge. There was no special finding of facts. The judgment, entered May 19th, 1883, stated that "the court finds for the defendant upon all the causes of action pleaded by the plaintiff, upon coupons which were more than five years past due when these actions were brought, and, upon all other causes of action pleaded by the plaintiff in the said two several actions, the court finds for the plaintiff, and assesses his damages at" $19,537.65. The judgment was for the plaintiff for that amount, with costs. In the first suit, the answer set up as a defence to the causes of action on the coupons which were more than five years past due when the suit was brought, the Nebraska statute of limitations.

There was, in the record, a bill of exceptions, which stated that it contains all the evidence offered or given by either party in the trial of the case, but it contained no exception to anything by either party, nor did the record contain any exception to any ruling of the court. The bonds and coupons and the records of the county commissioners were made a part of the bill of exceptions. The rest of the bill consisted of oral testimony.

There was, however, in the record, a certificate signed by the circuit judge and the district judge, and filed the same day the judgment was entered, stating that, in the course of the trial, the following questions arose for determination, that is to say:

"First. Whether the commissioners of the defendant had the power to issue bonds under either of the statutes, copies of which are hereto attached, marked 'A' and 'B,' without first giving four weeks' notice of the election, as provided by section 26 of 'act marked 'B,' so that the same would be good and valid in the hands of a *bona fide* holder? Second. If the power to issue bonds existed under either of said statutes, was it a defence available to the county against a *bona fide* holder of the bonds in suit, that the election, in pursuance of which they were issued, was for the purpose of determining whether the county should issue its bonds to the amount of $200,000, for the purpose of securing an eastern connection for Nebraska City, when only $40,000 was issued under said vote? Third. The order for the election not providing for the submission of a provision to levy a tax, as required by section 27 of the act marked 'B,' should it be presumed that the proposition to issue the bonds submitted and voted on at an election was not accompanied by a provision to lay the tax as required in said act, and, if such presumption is to be indulged, was the presumed fact a defence available to the county against a *bona fide* holder of the bonds? Fourth. Was it a defence available to the county against a *bona fide* holder, that the bonds in suit, after being issued in pursuance of a vote held under one or both of said acts, were donated to the railroad company; provided it were located within one and one-half miles of Nebraska City? Fifth. If originally illegal and void, were the bonds validated by the

acts, copies of which are hereto attached, marked 'C' and 'D?'" The act marked "A." is the Territorial act of January 6th, 1860; the act marked "B" is the Territorial act of January 11th, 1861; and the acts marked "C" and "D" are the two State acts of February 15th, 1869. The certificate further states that, "the circuit judge being of the opinion that, all of said questions notwithstanding, judgment should be for the plaintiff, and the district judge being of the contrary opinion, it is ordered that judgment be entered for the plaintiff, and the said questions be certified to the Supreme Court for its consideration and answer, . . . at the request of counsel."

Each party sued out a writ of error to review the judgment.

*Mr. J. M. Woolworth* for Baldwin.

*Mr. O. P. Mason, Mr. I. N. Shambaugh,* and *Mr. J. C. Watson* for Otoe County.

MR. JUSTICE BLATCHFORD delivered the opinion of the court. After reciting the facts in the foregoing language, he continued:

The condition of the record is such, in the absence of an exception by either party to any ruling of the court in the progress of the trial, and of a special finding of the court upon facts, that there is nothing open for our consideration outside of the questions embraced in the certificate of the judges. We accept the certificate as sufficient to warrant an answer to the fifth question, although it does not state, in the terms of § 652 or § 693 of the Revised Statutes, that the judges disagreed upon the points stated in the five questions, or that their opinions were opposed upon such questions, but only that they disagreed as to whether the judgment should be for the plaintiff or the defendant, notwithstanding all of said questions. Having arrived at the conclusion that the fifth question must be answered in the affirmative, and such result disposing of the writ of error taken by the defendant, we do not deem it necessary to answer the other four questions. The fifth question assumes that the bonds were originally illegal and void, and we so assume, without so deciding, in answering that question.

The question is not an open one, on this record, as to whether the plaintiff is a *bona fide* owner of the bonds and coupons for value, without knowledge or notice of any facts affecting their validity, as alleged in the petitions and replies and denied in the answers. That issue is found for the plaintiff by the general finding in his favor as to all the causes of action except those on coupons which fell due before July 1st, 1877. This general finding has the same effect as the verdict of a jury, and we cannot review it.

It is contended for the defendant that the failure to give the four weeks' notice of the election, as provided by § 26 of the act marked "B," and the failure to include in the vote the question of taxation, as provided by § 27, constituted such a want of power to issue the bonds that the legislature could not validate their issue.

The Territorial act of January 11th, 1861, the proceedings for the election and its result, and the State act marked "D," were before this court in *Railroad Company* v. *County of Otoe*, 16 Wall. 667, at December Term, 1872. After that act was passed, and in September, 1869, the commissioners of Otoe County issued to the Burlington and Missouri River Railroad Company, named in that act, as a donation, the $150,000 of bonds mentioned in it, the e having been no vote of the people, other than the one above mentioned, authorizing the issue of the bonds. The bonds and their coupons were transferred for value, and before the maturity of any of the coupons, by that company, to the Chicago, Burlington and Quincy Railroad Company, and it sued the county, on some of the coupons, in the Circuit Court of the United States for the District of Nebraska. Upon the trial of that suit, two questions were certified to this court: 1. Whether the act marked "D," authorizing the county to issue bonds in aid of a railroad outside of the State, conflicted with the Constitution of the State. 2. Whether the county commissioners, under that act, could lawfully issue the bonds without the proposition to vote the bonds for the purpose indicated, and also a tax to pay the same, being or having been submitted to a vote of the people of the county, as provided by the Territorial act of January 11th, 1861. This court held,

1. That the act of February 15th, 1869, authorizing the county of Otoe to issue bonds in aid of a railroad outside of the State, did not conflict with the Constitution of the State.   2. That it was a valid exercise of legislative authority, to authorize a county to incur indebtedness and impose taxation, in aid of railroad companies.   3. That the legislature could constitutionally authorize a donation of the county bonds to the railroad company.   4. That it could authorize aid to a railroad beyond the limits of the county and outside of the State.   5. That, under said act of February 15th, 1869, the county commissioners could lawfully issue the $150,000 of bonds, without a vote of the people, as provided by the Territorial act of January 11th, 1861, on the proposition to issue them and on the question of taxation to pay them.   This court said, by Mr. Justice Strong : " If the legislature had power to authorize the county officers to extend aid on behalf of the county or State to a railroad company, as we have seen it had, very plainly it could prescribe the mode in which such aid might be extended as well as the terms and conditions of the extension, and it needed no assistance from the popular vote of the municipality.   Such a vote could not have enlarged legislative power.   But the act of 1869 was an unconditional bestowal of authority upon the county commissioners to issue the bonds to the railroad company.   It required no precedent action of the voters of the county.   It assumed that their assent had been obtained.   That prior to 1869 the sanction of approval by a local popular vote had been required for municipal aid to railroad companies or improvement companies, is quite immaterial.   The requisition was but the act of an annual legislature, which any subsequent legislature could abrogate or annul."

It cannot be doubted that the two acts of February 15th, 1869, taken together, intended to legalize the $40,000 of bonds issued to the Council Bluffs and St. Joseph Railroad Company. These bonds fall within the description of section 8 of the act marked " C," as bonds theretofore " voted and issued " by the county of Otoe to aid in the construction of a railroad.   The vote was a vote of the county to issue $200,000 of bonds " for the purpose of securing an eastern railroad connection for

Nebraska City;" and the $40,000 of bonds were issued as a donation to said company, to aid it in building a railroad so near to Nebraska City as to secure to that city and to the county of Otoe an eastern railroad connection by the way of St. Joseph. The defects and irregularities alleged in respect to the bonds were defects and irregularities in submitting to a vote of the people of the county the question of issuing the bonds, in regard to the publishing of notice, and in regard to including in the vote the question of taxation. It was alleged that the bonds were not voted upon or issued in conformity with law. The statute enacted that, notwithstanding such defects or irregularities, the bonds should be legal and valid, and should have the same legal validity and binding force as if they had been legally authorized, voted upon and executed. The act of the same date, marked "D," refers to and identifies sufficiently the election held, and the authority given by the vote to the county commissioners to issue the bonds of the county to the amount of $200,000, "to any railroad in Fremont County, Iowa, that would secure to Nebraska City an eastern railroad connection." It recites the authority as one to issue the bonds "in payment of stock." But the question is one merely of identity, and it is not pretended there was any election in Otoe County to the purport set forth, including the words "in payment of stock," while there was just such an election leaving out those words. The identity is further shown by the words in the act, "and whereas but forty thousand dollars have been issued," and by the authority given to issue $150,000 "of the bonds aforesaid," that is, of the $200,000 of bonds so voted, as a donation to any railroad company that would "secure to Nebraska City a direct eastern railroad connection." It is not pretended that any $40,000 of bonds were issued except those named in the bonds sued on in this suit. Taking the two acts together, the legislature recognized the fact that the voters of Otoe County had voted to issue $200,000 of bonds to secure an eastern railroad connection for Nebraska City in that county; that $40,000 had been issued; and that the defects and irregularities before named were alleged to have occurred in respect to the voting upon and issuing the $40,000 of the bonds; and it enacted that

those bonds should be legal and valid, and that $150,000 more of the $200,000 should be issued for the same purpose.

The decision by this court in regard to the $150,000 of bonds leaves but little more, to say in regard to the $40,000. As the legislature had power to authorize the issue of bonds without any precedent action of the voters of the county, it could validate the issue of bonds by curing and legalizing defects in respect to the voting. The bonds were assigned by the railroad company, and came to the plaintiff after the acts of 1869 were passed, and he became a *bona fide* holder of them on the faith of those acts. The doctrine is well settled in this court, that the legislature of a State, unless restrained by its organic law, has the right to authorize a municipal corporation to issue bonds in aid of a railroad, and to levy a tax to pay the bonds and the interest on them, with or without a popular vote, and to cure, by a retrospective act, irregularities in the exercise of the power conferred. *Thompson* v. *Lee County*, 3 Wall. 327; *Campbell* v. *City of Kenosha*, 5 Id. 194.

Much stress is laid by the defendant on the decision of the Supreme Court of Nebraska in *Hamlin* v. *Meadville*, 6 Neb. 227, in 1877. That was a suit brought in February, 1871, by an owner of property in Otoe County, to enjoin the county treasurer from collecting a tax levied on his property to pay the interest on these $40,000 of bonds and to have the bonds declared void. A judgment to that effect was rendered and was affirmed by the Supreme Court. The question adjudged in the case was the power conferred on the county commissioners, by the acts of 1860 and 1861, to issue the bonds. It was held that the only authority, if any, given by the vote of the people, was to subscribe for stock in a railroad company. The act marked " C" was not considered. It was held that it was not the purpose of the act marked " D" to legalize the $40,000 of bonds, but only to authorize the issue of the $150,000 of bonds; and that the only subject or object expressed in its title was the issuing of bonds.

The adjudication in *Hamlin* v. *Meadville* is not set up as a judgment binding on the plaintiff. Nor can it be. He was no party to it, nor was any holder of the bonds.

It is objected that the act marked "C" is void because section 19 of article 2 of the Constitution of Nebraska of 1867, provided that "no bill shall contain more than one subject, which shall be clearly expressed in its title," and because the act does not comply with those provisions. It is plain, we think, that the bill does not contain more than one subject. That subject is municipal bonds issued or to be issued to aid in making works of internal improvement. There is but one purpose, object, or subject, and that is the aiding of such works by bonds and the status of such bonds. The subject of the act, to authorize future bonds and legalize existing bonds, for such purpose, is clearly expressed in its title.

But it is objected that the title of the act is limited to bonds issued or to be issued to aid works in Nebraska, while the body of the act extends to works anywhere; and that so the subject of the act is not expressed in its title. The first section of the act relates to the future issues of bonds by "any county or city in the State," the seventh section relates to like issues by "any precinct in any organized county of this State," and the eighth section relates to "bonds heretofore voted and issued by any county or city in this State." The railroads and works of internal improvement referred to in the body of the act are not limited to those situated in the State. It would, we think, be a strained construction, to hold that the title of the act is to be so interpreted as to be limited to works situated in the State, when such limitation does not exist in the body of the act, and when the words "in this State," in the title, may fairly be regarded as applicable to the prior words "counties, cities, and precincts," to which words they are applied in the body of the act. This principle of construction is sanctioned by the views expressed in *Montclair* v. *Ramsdell*, 107 U. S. 147, and in *City of Jonesboro'* v. *Cairo & St. Louis Railroad Company*, 110 U. S. 192. See also Cooley's Constitutional Limitations, 141, *et seq.* We have not been referred to any decision of the Supreme Court of Nebraska which we regard as in conflict with these views.

The question sought to be raised by the writ of error of the plaintiff is, that the statute of limitations had not run against

the coupons which were more than five years past due when the first suit was commenced, because, under section 17 of the Code of Civil Procedure of Nebraska, the disability of a married woman, from whom the plaintiff purchased the bonds, intervened for a sufficient time, between their date and such purchase by him, to prevent what would otherwise be the bar of the statute. Without considering that question, it is sufficient to say, that the facts on which it could be raised are not admitted in the pleadings or specially found by the court, and that the general finding for the defendant on the causes of action on coupons which were more than five years past due when the actions were brought, and the absence of any exception by the plaintiff to any ruling of the court in regard to the question, preclude any adjudication here upon it.

*The fifth question certified is answered in the affirmative, and the judgment of the Circuit Court is affirmed.*